568 A.2d 985

**Ronald YURICK and Carol Yurick, jointly and individually, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 6, 1989.

Decided Dec. 20, 1989.

488

Simon Noel, Pittsburgh, for petitioners.

Matthew W. Tomalis, Deputy Atty. Gen., with him, Ernest D. Preate, Jr., Atty. Gen., for respondent.

Before BARRY and McGINLEY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

Ronald and Carol Yurick (Yuricks) have petitioned for our review of three orders of the Board of Finance and Revenue (Board) which upheld the sales tax assessments made by the Department of Revenue against the Yuricks both jointly and individually.

An appeal from a determination of the Board is *de novo* in this Court. *See* Pa.R.A.P. 1571(f). In this case, the Yuricks and the Commonwealth have filed a partial stipulation of facts. In addition, an evidentiary hearing was held, pursuant to Pa.R.A.P. 1542(b), on June 20, 1989. From the

parties' stipulation and from the evidence adduced at the hearing, we make the following findings of fact:

## FINDINGS OF FACT

1.  Ronald M. and Carol D. Yurick owned and operated a business known as The Tubbery, Inc. in Monroeville, Pennsylvania, with said business being engaged primarily in the business of selling hot tubs, spas, exercise equipment, and related items and services.

2.  At all times during the period from July 1, 1983 to April 2, 1985, all of the stock of The Tubbery, Inc. was titled to the Yuricks, either individually or as husband and wife.

3.  In the normal course of the corporate business, the Yuricks sold items for which sales tax was legally required to be collected by them.

4.  It was the regular practice of the Yuricks to collect sales tax on all sales they made, except for those sales for which the purchaser presented a valid exemption certificate.

5.  During the period from July 1, 1983 to April 2, 1985, the Yuricks collected sales tax on sales at retail of their merchandise, but failed to remit to the Commonwealth more than $10,000 of the tax collected.

6.  The Yuricks are unable to account for the monies collected as sales tax but not remitted to the Commonwealth, although they admitted that the funds were applied to expenses of the business in lieu of their having to use their personal funds to satisfy their obligations.

7.  In late 1984, the Yuricks were contacted by Richard Varlotto, an investigator with the Department of Revenue, in an effort to collect the sales tax owed by them due to their failure to remit the tax they had collected.

8.  Between late 1984 and March 7, 1985, the Yuricks and Mr. Varlotto held several discussions toward arranging for them to satisfy their outstanding sales tax liability by way

of a deferred payment plan, although the Yuricks never executed such an agreement.

9. The Yuricks decided to sell their business in late 1984. After investigating potential candidates, they selected Jonathan Burleigh.

10. The Yuricks sold The Tubbery, Inc. to Jonathan Burleigh on April 2, 1985. The agreement was structured so that Mr. Burleigh would acquire the assets of the business for $1.00 plus assumption of the liabilities.

11. Among the liabilities Mr. Burleigh assumed were three debts for which the Yuricks were personally liable: a Small Business Administration loan, the lease on the business premises, and the Pennsylvania sales taxes collected but not remitted.

12. Mr. Burleigh paid off the Small Business Administration loan and executed a new lease with the lessor of the business premises, extinguishing the Yuricks' personal liability with respect to those two items.

13. On March 7, 1985, at The Tubbery, Inc., the Yuricks introduced Mr. Varlotto to Mr. Burleigh as someone to whom they intended to sell their business.

14. After further discussions with Mr. Varlotto, to which the Yuricks were not parties, Jonathan Burleigh executed a deferred payment agreement to pay The Tubbery, Inc.'s sales tax in the amount of $14,336.23 over a period of 24 months.

15. Pursuant to the deferred payment agreement, Jonathan Burleigh paid $1,500 to Richard Varlotto on May 28, 1985 and made four subsequent installment payments of $534.84 each.

16. Mr. Burleigh's entry into a deferred payment plan for the payment of the Yuricks' sales tax liability was approved by Mr. Varlotto's supervisors at the Department of Revenue on or about May 29, 1985.

17. Although Mr. Burleigh advised the Yuricks sometime in June 1985 that he had signed a deferred payment

agreement, the Yuricks did not see a copy of the agreement itself until January 6, 1989.

18. The Yuricks did not ask Mr. Varlotto whether Mr. Burleigh's execution of the deferred payment agreement operated so as to release them from their tax liability, although they assumed that they were thereby released.

19. Mr. Varlotto did not tell the Yuricks that Mr. Burleigh's agreement to pay their sales taxes released them from personal liability.

20. The Yuricks were not aware that Mr. Burleigh had ceased making payments pursuant to his deferred payment agreement until they received the assessments at issue in this case.

21. The Yuricks, both individually and jointly, were assessed sales tax and associated penalty, legal and interest amounts by the Department of Revenue in the following amounts:

| | |
|---|---|
| Sales Tax | $ 7,100.63 |
| Penalty | 3,301.33 |
| Legal | 30.00 |
| Interest | 2,259.85 |
| TOTAL | $12,691.81 |

All assessments covered the period of July 1, 1983 to December 5, 1985, and bear an assessment mailing date of February 4, 1987. The three assessments, against Ronald M. Yurick, Carol D. Yurick and Ronald M. and Carol D. Yurick, as tenants by the entireties, representatives of The Tubbery, Inc., have been consolidated for our purposes.

22. The attorney who represented the Yuricks in the sale of their business to Mr. Burleigh testified via affidavit that she informed the Yuricks that they were personally responsible for the payment of the sales taxes on March 23, 1985, March 26, 1985, April 1, 1985, September 4, 1985 and September 9, 1987. The Yuricks did not solicit her advice with respect to the effect Mr. Burleigh's deferred payment agreement would have upon their personal liability.

23. The sale of the business to Mr. Burleigh was structured so as to protect the Yuricks in the event of a default

by Jonathan Burleigh. Mr. Burleigh executed an agreement pledging the outstanding stock of The Tubbery, Inc. to the Yuricks pending satisfaction of his obligations. Additionally, the Yuricks took a security interest in all assets of the business. This security agreement, by its terms, remains in effect so long as the liabilities assumed by Mr. Burleigh remain unpaid.

24. As of the date of the evidentiary hearing on June 20, 1989, neither party was aware of Mr. Burleigh's whereabouts.

25. The Yuricks filed timely petitions for review of the assessments with the Board of Appeals, the Board of Finance and Revenue and this Court.

## DISCUSSION

The issue before us is whether the Yuricks are personally liable for the sales taxes collected. Section 202(a) of the Tax Reform Code of 1971 (TRC), Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7202(a), imposes a tax of 6 percent of the purchase price upon each retail sale of tangible personal property or services, which "tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth." Section 225 of the TRC, 72 P.S. § 7225, establishes personal liability for sales taxes collected as follows:

All taxes collected by any person from purchasers in accordance with this article and all taxes collected by any person from purchasers under color of this article which have not been properly refunded by such person to the purchaser shall constitute a trust fund for the Commonwealth, and such trust shall be enforceable against such person, his representatives and any person (other than a purchaser to whom a refund has been made properly) receiving any part of such fund without consideration, or knowing that the taxpayer is committing a breach of trust: Provided, however, That any person receiving payment of a lawful obligation of the taxpayer from such

fund shall be presumed to have received the same in good faith and without any knowledge of the breach of trust. Any person, other than a taxpayer, against whom the department makes any claim under this section shall have the same right to petition and appeal as is given taxpayers by any provisions of this part.

The Yuricks have not contested the fact that they were originally personally liable for the sales taxes they collected but did not remit to the Commonwealth. However, they argue on appeal 1) that a transfer of tax liability has occurred, releasing them from liability, or, in the alternative, 2) that the Commonwealth should be equitably estopped from enforcing the assessments against them.

With respect to the first argument, the Yuricks focus upon the deferred payment agreement executed by Jonathan Burleigh. That agreement contains the following language:

Under present financial conditions, I am unable, at this time, to pay the taxes I owe in the amount shown below. Permission is requested to pay these taxes, plus accrued penalties and interest as follows:

TOTAL LIABILITY $14,336.23

LENGTH OF PLAN 24 months

$1,500.00 to be paid on 5/28/85 and $534.84 to be paid on the 30th of each month until the liability, plus updated Penalties and Interest, is paid in full. If approved, all payments should be made payable to the Commonwealth of Pennsylvania, and forwarded to the Pittsburgh DISTRICT OFFICE, at the above return address.

\*  \*  \*  \*  \*  \*

I agree to pay, as they become due, all other taxes due the Commonwealth of Pennsylvania for which I become liable during the term of this agreement. If I fail to meet any of the conditions of this agreement, my option to make installment payments will be withdrawn and the total amount of my ... liability will become due and payable immediately. In this event, the Commonwealth

will pursue its collection by legal means without further notification to me. A completed financial statement is attached; I also agree to submit any new financial statements applicable to any re-evaluation of this agreement.

The deferred payment plan was subject to Department of Revenue approval and, as noted in the Findings of Fact, was approved on May 29, 1985. The essence of the Yuricks' argument is that Mr. Burleigh's agreement to pay the Commonwealth, coupled with the Commonwealth's acceptance of the deferred payment plan, operates to relieve them of liability.

In support of this proposition, the Yuricks rely upon various federal tax cases by way of analogy. We have carefully reviewed each of the authorities cited and find all to be distinguishable. The common distinguishing factor is that all of the cited cases discuss the liability of the *transferee* for taxes owed by the transferor in situations involving various transfers of assets.[1] In those cases, the Internal Revenue Service elected to proceed against the trans-

---

1. The cases upon which the Yuricks rely are: *Turnbull, Inc. v. Commissioner,* 373 F.2d 91 (5th Cir.1967), *cert. denied,* 389 U.S. 842, 88 S.Ct. 72, 19 L.Ed.2d 105 (1967) (transferee, a successor corporation to transferor, liable for liabilities of transferor corporation where transferee accepted liabilities both in merger agreement and by signing Internal Revenue Service form 2045); *Napsky v. Commissioner,* 371 F.2d 189 (7th Cir.1966) (although transferees had executed agreement accepting transferee liability for unpaid taxes, extent of liability was not at issue); *Bos Lines, Inc. v. Commissioner,* 354 F.2d 830 (8th Cir.1965) (transferee of the assets of a dissolved corporation held liable for tax debts of transferor); *Bellin v. Commissioner,* 65 T.C. 676 (1975) (transferees of liquidated corporation liable for transferor's tax liability; court noted secondary nature of transferee's liability in discussing general rule that IRS must show attempts to collect from transferor, who is primarily liable, except in cases of liquidation); *Papineau v. Commissioner,* 28 T.C. 54 (1957) (transferee held liable for tax liability of transferor where transfer was without consideration and transferor, who was indebted at the time of transfer, was presumed, under New York state law, to be insolvent); *Brown v. Commissioner,* 24 T.C. 256 (1955) (discusses when transferees may be held secondarily liable for the primary tax liability of their transferors); *Denton v. Commissioner,* 21 T.C. 295 (1953) (without discussing validity of contract to assume liabilities, transferee determined not to be liable for tax deficiencies of transferor because no transfer of corporate assets was involved); and *Texsun Supply Corp. v. Commissioner,* 17 T.C. 433 (1951) (transferee held liable at law because of contractual agreement to assume liabilities of corporate transferor).

feree, usually because the transferor was a defunct corporation or an insolvent individual. While all discuss potential transferee liability, they do not do so in the context of the transferor's own liability. However, as noted in the case synopses,[2] two of the cited cases, *Bellin* and *Brown*, mention the fact that the transferor remains primarily liable for its debts, while the transferee may be secondarily liable.

Even if we were to accept the Yuricks' proposition that Mr. Burleigh may be subject to transferee liability, the Yuricks will not be thereby entitled to relief because the existence or extent of Mr. Burleigh's liability to the Commonwealth is simply not at issue here. While we have little doubt that the Commonwealth could proceed against Mr. Burleigh on the basis of his deferred payment agreement, it has not chosen to do so.[3] As the Commonwealth points out in its brief, federal tax law uses the concept of transferee liability as a secondary means of enforcing the primarily liability of the taxpayer. *See, e.g., Robbins Tire and Rubber Co. v. Commissioner*, 53 T.C. 275 (1969).

The proposition that a transferor remains primarily liable for tax deficiencies, as applied in federal tax practice, is entirely consistent with general principles of contract law. For example, our Superior Court has held that "[a] party with an original obligation to another cannot divest himself of liability to that party merely by contracting with a third party to assume that liability." *Husak v. Berkel, Inc.*, 234 Pa.Superior Ct. 452, 462, 341 A.2d 174, 179 (1975) (footnote omitted). The general rule is summarized in Section 141(1) of the Restatement of Contracts (1932) as follows:

> A creditor beneficiary who has an enforceable claim against the promisee can get judgment against either the promisee or the promisor or against each of them on their respective duties to him. Satisfaction in whole or in part of either of these duties, or of judgments thereon, satisfies to that extent the other duty or judgment.

**2.** *See* n. 1.

**3.** This is perhaps due to the fact that Mr. Burleigh's whereabouts are not known.

Because the Yuricks have not cited any authority for the proposition that a transfer of tax liability relieving them from responsibility has occurred, we must reject their first argument.

The second argument advanced by the Yuricks is that the Commonwealth should be equitably estopped from enforcing the assessments against them. The focus of this argument is, again, the deferred payment agreement negotiated between Mr. Burleigh and Mr. Varlotto and later approved by Mr. Varlotto's superiors. The Yuricks rely on this Court's decision in *Commonwealth v. King Crown Corp.*, 52 Pa.Commonwealth Ct. 156, 161, 415 A.2d 927, 929 (1980), wherein we described the doctrine as follows:

> Equitable estoppel is a doctrine of fundamental fairness, dependent on the particular facts of each case; it arises when 'a party, by acts or representations intentionally or through culpable negligence, induces another to believe that certain facts exist and such other relies and acts on such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts.' *Board of Education v. Philadelphia Federation of Teachers Local No. 3*, 40 Pa.Commonwealth Ct. 490, 506, 397 A.2d 1273, 1280 (1979).

The Yuricks argue that the doctrine must apply here because the Commonwealth, through Mr. Varlotto and with the approval of his superiors, entered into a deferred payment agreement with Mr. Burleigh, accepted payments from Mr. Burleigh, and made no effort to pursue the Yuricks for almost two years.

The Yuricks' reliance on *King Crown* is misplaced. While *King Crown* does establish that equitable estoppel may be invoked against the Commonwealth under certain circumstances, its facts are readily distinguishable from those before us. In *King Crown*, an assistant attorney general sent a letter to the taxpayer itself, King Crown Corp., which purported to accept the taxpayer's settlement proposal. Some eight months later, the Commonwealth notified the taxpayer that it considered the agreement inval-

id because it had not been properly approved. In concluding that the Commonwealth was estopped from denying the existence of the compromise settlement, we found that the following factors were relevant: the assistant attorney general, in discussions with the taxpayer, advised that he needed approval for a settlement; several days later, the assistant attorney general sent the letter advising acceptance of the settlement proposal; and the taxpayer's belief that approval had been secured was fully reasonable. In the matter before us, the Commonwealth's agent, Mr. Varlotto, did not negotiate directly with the Yuricks. This lack of direct communication between the Commonwealth and the taxpayer, standing alone, is sufficient to distinguish the facts of this case from those in *King Crown*.

In *Pennsylvania Liquor Control Board v. Venesky*, 101 Pa.Commonwealth Ct. 456, 516 A.2d 445 (1986), *petition for allowance of appeal denied*, 515 Pa. 590, 527 A.2d 549 (1987), we summarized the elements which must be demonstrated in order to apply the doctrine of equitable estoppel to a Commonwealth agency: the party sought to be estopped 1) must have intentionally or negligently misrepresented some material fact, 2) knowing or having reason to know that the other party would justifiably rely on the misrepresentation and 3) inducing the other party to act to his detriment because of his justifiable reliance on the misrepresentation. In addition, "[o]ne who asserts estoppel must establish the essential elements thereof by clear, precise, and unequivocal evidence." *Id.*, 101 Pa.Commonwealth Ct. at 460, 516 A.2d at 448.

Applying these elements to the facts of this case, we must conclude that the doctrine does not apply. The first element of the test set forth above requires a misrepresentation of a *material fact*. Here, the misrepresentation of which the Yuricks complain amounts to a mistaken conclusion of law, *i.e.*, that they were relieved of their personal liability for the payment of sales taxes because of the deferred payment agreement executed between Mr. Burleigh and the Commonwealth. It has been held that " '[a]

mutual mistake as to the law, knowledge of which is equally available to both parties, cannot raise an estoppel.' ... Similarly, an estoppel cannot be created by representations or opinions concerning matters of law." *Gabovitz v. State Automobile Insurance Association,* 362 Pa.Superior Ct. 17, 23, 523 A.2d 403, 406 (1987), *petition for allowance of appeal denied,* 516 Pa. 634, 533 A.2d 92 (1987) (citations omitted).

In addition, the mistake of law here arose not as a result of any misrepresentation by the Commonwealth, but rather as a result of an erroneous *assumption* by the Yuricks themselves that their tax liability was extinguished by the deferred payment agreement. They neither received nor sought an opinion from Mr. Varlotto regarding the effect of the agreement. Similarly, although they were represented by counsel in the sale of their business, and despite the fact that their attorney repeatedly advised them that they were personally liable for the sales tax payments, they did not seek legal advice with respect to the effect of the deferred payment agreement executed by Mr. Burleigh.

Our determination that there has been no misrepresentation here necessarily disposes of the second element of the *Venesky* test. Neither Mr. Varlotto nor his superiors negotiated with the Yuricks and had no reason to know that they assumed that their personal liability had been extinguished.

Finally, the Yuricks have not alleged that any action of the Commonwealth induced them to act to their detriment. Indeed, their only action amounted to inaction during the period they assumed Mr. Burleigh was making payments pursuant to the deferred payment agreement. We note that the sale of the business to Mr. Burleigh was effected prior to the date Mr. Burleigh executed the deferred payment agreement. Further, although the agreement of sale between the Yuricks and Mr. Burleigh provides the Yuricks with certain protections in the event of default by Jonathan Burleigh, the Yuricks have not alleged that they failed to avail themselves of these protections because of any action of the Commonwealth. Simply stated, because the Yuricks

did not change their position to their detriment, the third element of *Venesky* is not met. Accordingly, we conclude that the doctrine of equitable estoppel is not applicable to the facts of this case.

## CONCLUSIONS OF LAW

1. The Yuricks are personally liable for the payment of sales taxes collected but not remitted to the Commonwealth.

2. The Commonwealth is not equitably estopped from collecting the amounts specified in Finding of Fact No. 21.

In light of the foregoing, we shall affirm the order of the Board of Finance and Revenue.

## ORDER

AND NOW, this 20th day of December, 1989, the order of the Board of Finance and Revenue in the above-captioned matter is hereby affirmed. Exceptions may be filed within thirty (30) days of the date of entry of this order. If no exceptions are entered, the Chief Clerk may enter judgment for the Commonwealth in the amount of $12,691.81.